IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| DOUGLAS J. CHYATTE, | Cause No. CV 21-30-M-DLC |
| Petitioner, | |
| vs. | ORDER |
| BRIAN GOOTKIN, et al., | |
| Respondents. | |

This case comes before the Court on Petitioner Douglas Chyatte's petition for writ of habeas corpus. A jury convicted him of assault with a weapon, a violation of Mont. Code Ann. § 45-5-213 (2009). Chyatte is proceeding pro se. He is currently on conditional release.

Respondents ("the State") filed an answer and exhibits from the state court record on October 1, 2021 (Docs. 16–18). Despite extensions of time, Chyatte did not file a reply. A reply, however, is not mandatory.

## I.  Background

### A.  Summary of Trial Testimony[1]

The charge against Chyatte arose from an incident during a Mike Gordon concert at the Wilma Theater in downtown Missoula.  A first trial ended in mistrial.  At the second trial, commencing on August 29, 2012, Chyatte represented himself.

In the darkness, crowd, and general festive mayhem, no one had a clear view of the incident.  Witnesses gave broadly similar but nonspecific descriptions of the culprit.  The victim, Benjamin Moore, emphatically identified a person named Andrews in a photo line-up, but Andrews was in Vermont at the time of the stabbing.  As events played out, however, the State presented compelling evidence showing who was responsible.

Moore testified that a man dancing wildly crashed into him.  Moore pushed him back and said, "Don't start none and there won't be none."  When he turned away, he saw what he thought was a punch coming at him from the man.  Instead of a punch, he felt a series of "tings."  For a moment, he thought he had been tazed. Feeling under his jacket, he realized his shirt was bloody, and the man had stabbed him.  Dazed, he made his way back to his friends.

James Roof was nearby when the incident occurred.  He saw one man move

---

[1]  State's Ex. 3.1 (Doc. 16-3) includes the trial transcript at pages 151–644.

aggressively toward another.  He pulled the assailant off the victim and pushed him aside.  Roof's friend, Tucker Lamberton, saw the assailant fall into a chair with his arms flying up over and behind his head, turn and briefly reach over the back of the seat, then exit up the aisle.  Roof followed the assailant to the front door, pointed him out to security staff there, and said something to the effect of, "Don't let that guy back in.  He was fighting."

The Wilma security staff recognized Chyatte as the person Roof was pointing at, because Chyatte was a former Wilma employee.  They also knew Roof, who was a promoter.

Minutes later, Moore entered the front lobby, intending to leave and go to the hospital.  When security learned that Moore had been stabbed, they summoned an ambulance and the police.  Security, and shortly afterward police officers, entered the theater to clear the area where Moore had been.  Once Lamberton realized security and police were in the theater investigating, he directed them to the area where the assailant fell into the seat row.  Searching the floor in that area, Officer Harrington found a "Ruko" brand knife with a three-inch blade.

Harrington also interviewed Moore at the hospital.  Moore said the assailant wore a light gray hat with a straight brim.  Roof, too, described the assailant as wearing a white, "wool-ish," "elf-looking" hat with a straight brim.  Lamberton thought the assailant wore a blue baseball cap.  When Harrington collected

Moore's clothing, he found a blue baseball cap.

The same evening, police phoned Chyatte and asked to speak with him. Officer Rosling phoned Chyatte and told him there had been an incident at the Wilma, and some witnesses said Chyatte might know something about it. Chyatte agreed to meet Officer Rosling at Ole's convenience store on North Orange Avenue. Rosling arrived, but Chyatte did not appear. Rosling called him again. Chyatte said he had been at Ole's and left, but he would return. He still did not appear. Rosling called him again, and Chyatte replied that the police were "trying to hem him up on a bullshit charge." But he eventually told Rosling where he was—on Ryman Avenue near the Badlander bar, several blocks from Ole's.

Officer Smith spotted Chyatte and spoke with him. Smith asked Chyatte whether he had a knife and patted him down. He did not find a knife or any other weapon, but he found "a Mason jar full of marijuana" in Chyatte's pocket. He also took Chyatte's "gray, wool" hat, a "fisherman's cap or casual hat; certainly not a ball cap," and logged it into evidence. Chyatte agreed to accompany Smith to the police station. About half an hour later, Smith took a preliminary breath test from Chyatte, which showed a reading of 0.197.[2]

Detective Curtis and another officer interviewed Chyatte. Rosling had

---

[2] Presumably, Smith did the test because Chyatte was a probationer and not permitted to drink. The jury was not advised of a reason for the test.

already told him there had been an incident at the Wilma, and Curtis told him

several more times.  Chyatte responded, "But there's been no incident."  Later,

Chyatte said officers had told him there was a stabbing.  Curtis confirmed with

Rosling and Smith that they did not tell Chyatte about a stabbing.  Sergeant

McLean asked Chyatte where his knife was.  According to Curtis, Chyatte patted

his right front pants pocket, looked surprised, and said he did not have a knife.

When asked whether there was a reason his fingerprints would be on a knife,

Chyatte said, "[T]here is probably not, other than you guys setting me up.  But

that's cool."  Curtis asked for permission to swab Chyatte's hands.  Chyatte

declined.

Detective Lear testified that she asked the State crime lab to determine

whether the Ruko knife bore traces of Moore's and Chyatte's DNA.  Forensic

witnesses testified that Moore's DNA was found on the blade and Chyatte's on the

handle.  Lear also testified that Chyatte's white wool hat had a straight brim when

it was unfolded, and that she observed Chyatte wearing the hat when she viewed

the video from Officer Smith's patrol car.

In his case-in-chief, Chyatte established that his clothing bore traces of his

DNA, suggesting that he tended to "shed" DNA.  No blood or DNA from Moore

was found on Chyatte's clothing.  Chyatte also called an alibi witness, Laura Koch,

who testified that she was with him at the concert.  She said she ran into a friend,

Sky Berns, just outside the side door into the Wilma, when she was having a cigarette.  Sky told her that "BJ," meaning Moore, had been stabbed, and the cops were coming.  Koch and Chyatte left through the side door at that point.

Sky Berns testified in the State's rebuttal case.  He remembered seeing Moore dancing at the concert.  He also recalled talking to Chyatte, outside the side door, about a bottle of gin that Chyatte tried to bring inside but could not.  Sky did not recall telling either Chyatte or Koch about Moore being stabbed and did not recall seeing them after the stabbing.  Detective Curtis testified that Chyatte did not say at any point that he had been with Laura Koch or anyone else who would say they knew Chyatte did not stab anyone.  Chyatte did not call rebuttal witnesses.

On August 30, 2012, the jury found Chyatte guilty.

## B.  Post-Trial Hearing and Sentencing

Before sentencing, Chyatte retained counsel Mat Stevenson.  Stevenson saw "a significant history of mental issues" in Chyatte's file.  Concerned that Chyatte had not been competent when he waived his right to counsel and chose to represent himself, Stevenson requested time to obtain a psychological evaluation.  Sentencing was postponed to March 1, 2013.  Before the sentencing hearing, the trial court heard testimony from Dr. William Stratford and Chyatte concerning Chyatte's competency in August 2012.  It found that "clear and convincing evidence" supported his competence.

Proceeding to sentencing, the trial court designated Chyatte a persistent felony offender and imposed a prison term of twenty years, with ten of those years suspended.  *See* Judgment (Doc. 16-28) at 2.[3]

### C.  Direct and Collateral Review in State Court

Chyatte appealed.  On May 7, 2014, the Montana Supreme Court affirmed his conviction.  *See State v. Chyatte*, 2014 MT 125N ¶¶ 7–10.

Chyatte's conviction became final ninety days after the Montana Supreme Court's decision, on August 5, 2014, when his time to file a certiorari petition expired.  *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012); U.S. S. Ct. R. 13(1), (3).

Representing himself, Chyatte filed a petition for postconviction relief in the trial court on October 10, 2014, Day 65 after his conviction became final. Postconviction proceedings concluded on April 21, 2020.  *See Chyatte v. State*, 2015 MT 343; *Chyatte*, No. DA 16-0201 (Mont. Dec. 28, 2016); *Chyatte*, No. DA 18-0155, 2020 MT 96N; *see also* 28 U.S.C. § 2244(d)(2).  As the 90-day window to file a petition for writ of *certiorari* does not apply to state collateral proceedings,

---

[3]  Under Mont. Code Ann. § 46-18-502(1), persistent felony offender ("PFO") status triggers a mandatory minimum five-year sentence and elevates a defendant's maximum sentencing exposure to 100 years, replacing the maximum penalty specified for the offense.  The designation also authorizes enhanced penalties for certain subsequently-committed felony offenses.  *See id*. § 502(2).  The State must give notice of its intent to trigger the enhanced penalty by serving notice at or before the omnibus hearing.  *See* Mont. Code Ann. § 46-13-108(1).

*see Lawrence v. Florida*, 549 U.S. 327, 331–36 (2007), the federal limitations period began running again on April 22, 2020.

### D. Federal Petition

Chyatte's petition for writ of habeas corpus was received in this Court on March 17, 2021. He was living in a prerelease center at the time. Assuming the prison mailbox rule applies, Chyatte filed his federal petition on March 15, 2021. *See* Pet. (Doc. 1) at 32.

## II. Federal Claims

Chyatte's claims are reorganized here, but all are addressed. The federal petition raises the following claims:

A. Chyatte's counsel at the first trial, Clint Kammerer, was ineffective because he:

   (1) advised that he could not be convicted at trial because Moore identified someone else as the culprit, resulting in Chyatte's rejection of a favorable plea offer; and

   (2) was suspended from practice for 30 days, ending a month before the first trial.

B. Chyatte did not knowingly, voluntarily, and intelligently waive his right to counsel.

C. The trial court abused its discretion by denying Chyatte's for-cause challenge to a potential juror.

D. The trial court deprived him of a fair trial by not allowing him to question witnesses about a second knife found at the Wilma and introduce a photograph of the knife.

E.    The State deprived him of a fair trial by altering or destroying police reports.

F.    The trial court deprived him of a fair trial by not allowing him to cross-examine witnesses about the police reports.

G.    The trial court erred by admitted expert testimony about DNA without first determining whether the evidence was relevant, trustworthy, and scientifically valid.

H.    Chyatte was deprived of a fair trial by cumulative error.

I.    The trial court erred at sentencing by disregarding Chyatte's testimony that he had lupus and crediting instead the false testimony of a detention center nurse.

J.    Appellate counsel provided ineffective assistance by failing to raise the following issues:

    (1)    The trial court erred at sentencing by disregarding Chyatte's testimony that he had lupus and crediting instead the false testimony of a detention center nurse.

    (2)    The State deprived him of a fair trial by altering or destroying police reports.

    (3)    The trial court erred by admitted expert testimony about DNA without first determining whether the evidence was adequately relevant, trustworthy, and scientifically valid.

    (4)    The trial court deprived him of a fair trial by not allowing him to question witnesses about a second knife found at the Wilma and introduce a photograph of the knife.

### III.  Procedural Defects in the Federal Petition

The State asserts, correctly, that Chyatte filed his petition at least 28 days after time to file expired under 28 U.S.C. § 2244(d)(1)(A).  It also asserts that

Claims D–J are procedurally defaulted.  Some of these the Montana Supreme Court dismissed based on state procedural law, and two, Claims F and H, were not raised at all in state court.  The State may be correct about Chyatte's defaults as well.  These defenses are adequately preserved should it become necessary to address them.

Procedural issues, however, can rapidly become complex.  Chyatte has asked the Court to appoint counsel to represent him.  Before the Court could predicate a ruling on a procedural ground, appointment of counsel would likely be warranted.  Potentially, an evidentiary hearing or additional briefing would be required.  *See, e.g.*, *Mendoza v. Carey*, 449 F.3d 1065, 1071 (9th Cir. 2006); Rules 6(a), 8(c), Rules Governing § 2254 Cases.

For these reasons, a procedural ruling is not the best path forward.  The state court record supports a determination of all claims on their merits.  This ruling is made for the purpose of efficiency and does not in any way signal disrespect for the rulings of the Montana Supreme Court or the requirements of state procedural law.  It is simply easier to address the merits.

## IV.  Merits of the Federal Petition

### A.  Claims A, B, and C

The Montana Supreme Court decided Claims A, B, and C on the merits.  28 U.S.C. § 2254(d) precludes relief unless its adjudication of these claims:

(1)    resulted in a decision that was contrary to, or involved an
       unreasonable application of, clearly established Federal law, as
       determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable
       determination of the facts in light of the evidence presented in
       the State court proceeding.

A state court's decision is "contrary to" clearly established Supreme Court

law "if the state court arrives at a conclusion opposite to that reached by [the

Supreme Court] on a question of law" or "if the state court decides a case

differently than [the Supreme Court] has on a set of materially indistinguishable

facts."  A state court's decision is an "unreasonable application" of Supreme Court

law "if the state court identifies the correct governing legal principle . . . but

unreasonably applies that principle to the facts of the prisoner's case."  *Terry*

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).[4]

### 1.  Claim A:  Ineffective Assistance of Trial Counsel

The Montana Supreme Court decided this claim on Chyatte's first appeal of

the denial of his petition for postconviction relief.  *See State v. Chyatte*, 2015 MT

343 ¶¶ 19, 21.

---

[4]  This language appears in Part II of Justice O'Connor's opinion, most of which is a
concurrence.  Part II was joined by a majority of Justices and expresses the majority's ruling.
The petitioner's first name is included in the case title because the Supreme Court decided two
separate habeas corpus cases called *Williams v. Taylor* on April 18, 2000.  *See infra* n.6.

### (a)  Counsel's Suspension

Chyatte alleges that he was deprived of counsel during a critical stage of the proceedings when the attorney who represented him at his first trial, Clint Kammerer, was suspended from practicing law for 30 days.  Kammerer's suspension ended a month before the first trial.  After the first trial ended in a mistrial on a defense motion, Chyatte represented himself at the second trial and was convicted.  The Montana Supreme Court held that Chyatte was not prejudiced. *See Chyatte*, 2015 MT 343 ¶ 21.

Citing *United States v. Cronic*, 466 U.S. 648 (1984), Chyatte alleges he was "completely without counsel for crucial portions of the pretrial process."  Pet. at 23.  "Kammerer's absence due to a license suspension falls so far below accepted standards of sufficiency that the prejudicial impact of Kammerer's performance can be inferred."  Br. in Supp. at 22 (Doc. 2 at 30).

The Court is not aware of any clearly established Supreme Court case law holding that a 30-day suspension, or even a 30-day period of inaction on an attorney's part, violates the Sixth Amendment.  In a similar case, the Ninth Circuit Court of Appeals held that a lawyer's disbarment before trial, even coupled with the fact he had never been admitted to practice in the District where he represented the defendant, did *not* violate the Sixth Amendment.  *See United States v. Ross*, 338 F.3d 1054, 1055–57 (9th Cir. 2003) (per curiam).  "[S]o long as the lawyer had

been admitted to practice at one point in time, his bar status at trial was not dispositive of the ineffective assistance issue." *Id*. at 1056.  The court reasoned that the purpose of the Sixth Amendment right to counsel is to ensure the accused is able to receive a fair trial.  "[D]efects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Id*. at 1056–57 (quoting *Mickens v. Taylor*, 535 U.S. 162, 166 (2002)); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146–48 (2006); *Cronic*, 466 U.S. at 666–67; *see also United States v. Mouzin*, 785 F.2d 682 (9th Cir. 1986); *United States v. Hoffman*, 733 F.2d 596 (9th Cir. 1984), *both cited in Ross*, 338 F.3d at 1056.

Both the Montana Supreme Court, in Chyatte's case, and the Ninth Circuit, in *Ross*, *Mouzin*, and *Hoffman*, concluded that a disciplinary action against an attorney does not, by itself, suggest the defendant will not receive a fair trial.  None of these decisions contradict or unreasonably apply Supreme Court law.

In addition, Chyatte did not identify anything that happened, or anything that should have happened but did not, during or because of Kammerer's suspension. *See* Hr'g Tr. (Doc. 16-47) at 108:2–110:8; Appellant Br. at 16–18 (Doc. 16-39 at 23–25); Appellant Reply at 8–9 (Doc. 16-41 at 14–15).  The Montana Supreme Court's decision was not based on an unreasonable determination of the facts.

Because Chyatte cannot meet the requirements of § 2254(d), this portion of his claim of ineffective assistance is denied.

13

### (b)  Bad Advice Concerning Plea Agreement

Chyatte also alleges that bad advice from Kammerer led him to reject a favorable plea offer.  Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984).  Chyatte must allege facts sufficient to support an inference (1) that counsel's performance fell below an objective standard of reasonableness, *id.* at 687-88, and (2) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.  "[T]here is no reason . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.  When a defendant alleges that counsel's bad advice caused him to forego a plea agreement, he must show a reasonable probability that he would have accepted the plea offer if he had been competently advised.  *See Lafler v. Cooper*, 566 U.S. 156, 163–70 (2012).

In state court, Chyatte alleged that Kammerer cited *State v. Cochran*, 1998 MT 138, and told him that Moore's identification of Andrews in the photo line-up meant that Chyatte could not be convicted.  *See* Postconviction Pet. (Doc. 16-36) at 2 ¶ 5(a); Postconviction Mem. (Doc. 16-37) at 1–3; Postconviction Aff. (Doc. 16-36) at 9 ¶ 9; Appellant Br. at 2–3, 6, 7, 16–17 (Doc. 16-39 at 9–10, 13, 14, 23–24).[5]  The Montana Supreme Court found that Chyatte could not show a reasonable

---

[5]  Chyatte did not reply on this point because the State conceded that the claim should be

probability he would have accepted the plea offer if he had understood counsel's advice was wrong.  *See Chyatte*, 2015 MT 343 ¶ 19.  The court noted that the trial court had "commented that this was an issue that Chyatte could raise at trial."  And the plea offer remained open for five days after the pretrial motion's denial.  *See id.*

In this Court, Chyatte adds one allegation.  He asserts that Kammerer told him the trial court "must grant a mid-trial motion for directed verdict due to Moore's positive identification of an individual other than Chyatte."  Pet. at 23. This allegation is not addressed by the Montana Supreme Court's reasoning that the plea offer remained open after denial of the pretrial motion to dismiss.

A reasonable jurist might consider that the Montana Supreme Court unreasonably determined the facts in light of the evidence presented to it.  *See* 28 U.S.C. § 2254(d)(2).  In the state proceedings, Chyatte did not specify that Kammerer told him a directed verdict would be granted mid-trial.  But he did allege that Kammerer said "it was legally impossible to convict me." Postconviction Pet. (Doc. 16-36) at 9 ¶ 9.  A reasonable but poorly advised lay person might read the trial court's ruling to mean that Chyatte could still be entitled to dismissal, provided Moore testified at trial to his identification of Andrews.  *See* Trial Court Order (Doc. 16-13) at 1–4.[6]  Chyatte's specific

---

remanded for an evidentiary hearing.
    [6] This is not a criticism of the trial court's Order but an attempt to read it from Chyatte's perspective at the time.

reference in his federal petition to a directed verdict at trial is arguably included within his general allegation of "legal impossibility" in his state-court pleadings. It is also notable, though not decisive, that the State did not ask the Montana Supreme Court to affirm the trial court's denial of this claim. On the contrary, the State conceded an evidentiary hearing was appropriate to allow development of the claim. *See* Appellee Br. at 27–28 (Doc. 16-40 at 32–33). Therefore, the Court will assume that Chyatte meets the requirement of § 2254(d)(2), so that relief is not precluded in this Court.

Even so, the claim fails for lack of merit. Chyatte's conduct later in the state proceedings showed that he did not want to accept the plea agreement. He wanted a new trial. *See Chyatte*, 2020 MT 96N ¶ 10; *see also* Trial Court Order (Doc. 16-50) at 9–10; Hr'g Tr. (Doc. 16-47) at 21:12–23:14 (hearing at which Chyatte appeared pro se); *id*. at 62:2–63:3, 111:3–117:13 (hearing with assistance of counsel).[7] He was not entitled to a new trial. *See Cooper*, 566 U.S. at 163–70.

Under the facts Chyatte alleges, an alternative form of prejudice must also be considered. He could have been harmed by predicating his defense at trial on counsel's bad advice. *Cf. Cooper*, 566 U.S. at 168–69. Chyatte did, in fact, move for a directed verdict based on Moore's identification of Andrews. *See* Trial Tr.

---

[7] The state courts' finding on this point is presumed correct. *See* 28 U.S.C. § 2254(e)(2); *Shinn v. Ramirez*, __ U.S. __, 142 S. Ct. 1718 (2022); *Michael Williams v. Taylor*, 529 U.S. 420, 434 (2000). At any rate, the citations show that it is well-supported in the record.

(Doc. 16-3) at 574:13–25.[8]  But in both his motion at trial, *see id*. at 575:1–3, and in presenting his entire defense at trial, Chyatte explored numerous avenues and sharply contested the State's case on the facts.  Chyatte clearly did not rely on and was not prejudiced by counsel's advice that his acquittal was legally mandated because Moore identified Andrews.

The record contradicts the possibility that Chyatte was prejudiced by Kammerer's alleged advice.  The second prong of the *Strickland* test is not met.  Chyatte's claim of ineffective assistance is denied.

### 2.  Claim B:  Competency to Waive Counsel

Chyatte contends that he did not "rationally," Br. in Supp. (Doc. 2) at 24, or "knowingly and voluntarily" waive his right to counsel because he was "'more likely than not psychotic'" at the time, *see* Pet. (Doc. 1) at 17.  The Montana Supreme Court denied relief on the merits on direct review.  *See Chyatte*, 2014 MT 125N ¶¶ 9–10.

### (a)  Clearly Established Federal Law

All criminal defendants must be competent to participate in legal proceedings.  "Requiring that a criminal defendant be competent has a modest aim: It seeks to ensure that he has the capacity to understand the proceedings and to

---

[8]  State's Ex. 3.1 (Doc. 16-3) contains several, but not all, pretrial and post-trial hearings as well as the trial transcript.  For brevity, Doc. 16-3 is called "Trial Tr." when it is cited in this Order, even if the matter cited is a hearing rather than trial.

assist counsel." *Godinez v. Moran*, 509 U.S. 389, 402 (1993); *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975); *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam).   Orientation to time and place and the ability to recall some events, for example, is not enough, *see Dusky*, 362 U.S. at 402, but the competency standard is not a demanding one.   For this reason, the law presumes the defendant has the required capacity unless there is a "bona fide doubt" that he possesses it. *See Moran*, 509 U.S. at 401 n.13; *see also Drope*, 420 U.S. at 181–82; *Pate v. Robinson*, 383 U.S. 375, 385 (1966).   Once a doubt materializes, the trial court must make an inquiry sufficient to resolve the issue.   *See Pate*, 383 U.S. at 385–86.

The same standard of competence applies to all criminal defendants, regardless of whether they stand trial, plead guilty, or represent themselves.   *See Moran*, 509 U.S. at 397–400.   But defendants who plead guilty or choose to waive counsel must face a second test.   A judge must find that these defendants waive their rights knowingly and voluntarily.   *See id*. at 400–02.   To support a waiver of the right to counsel, the record must reflect that the defendant is aware of "the dangers and disadvantages of self-representation." *Faretta v. California*, 422 U.S. 806, 835 (1975).

The test of competence is whether a defendant has "the *ability* to understand the proceedings." *Moran*, 509 U.S. at 401 n.12 (emphasis in original).   "[T]he purpose of the 'knowing and voluntary' inquiry . . . is to determine whether the

defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Id*. (emphasis in original); *see also, e.g.*, *Westbrook v. Arizona*, 384 U.S. 150 (1966) (per curiam).

Chyatte contends that a higher standard of competency applies to a waiver of the right to counsel. *See, e.g.*, Br. in Supp. at 15–16. He is mistaken. In *Moran*, the Supreme Court addressed the Ninth Circuit's "higher" standard and said, "[W]e reject the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard." *Moran*, 509 U.S. at 398; *see also id*. at 396–97 (citing with disapproval *Sieling v. Eyman*, 478 F.2d 211, 214–15 (9th Cir. 1973)). A defendant who meets the competency standard of *Dusky* is competent to waive rights knowingly and voluntarily. Federal law does not recognize a possibility that a defendant may be competent to stand trial but not competent to plead guilty or waive counsel.

In 2008, the Supreme Court held that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Indiana v. Edwards*, 554 U.S. 164, 178 (2008). In other words, a trial judge may limit the right to self-representation if the defendant meets the *Dusky* standard and

19

knowingly and voluntarily waives the right to counsel but, even so, is severely

mentally ill in a way that prevents him from conducting trial proceedings himself.

*See id*. at 174–75.  In that sense, the ability to represent oneself at trial may differ

from the ability to stand trial and to knowingly and voluntarily waive rights.  In

sum, competency to stand trial is the same thing as competency knowingly and

voluntarily to waive trial and waive counsel.  These capacities are not the same as

ability to represent oneself at trial.

  *Edwards* is instructive here because it acknowledges that self-representation

(particularly at trial) requires a specific and more complex level of mental acuity

than the *Dusky* standard.  *Edwards* also shows that acknowledging this fact does

not require a wholesale reworking of the competency standard.  Finally, the facts

of *Edwards* are illuminating because they fall far afield from Chyatte's case.

*Compare, e.g.*, *Edwards*, 554 U.S. at 167–69, 179, *with* Trial Tr. (Doc. 16-3) at

629:1–631:24.  But, ultimately, *Edwards* addresses only a trial judge's discretion

to *limit* a defendant's right to represent himself.  *Edwards* does not address or alter

the standard of competence required to support a waiver of the right to counsel.

### (b)  Merits

### (i)  § 2254(d)(1)

  The Montana Supreme Court acknowledged that Chyatte had to be aware of

the dangers and disadvantages of self-representation.  *See Chyatte*, 2014 MT 125N

¶ 9.  It referred to facts showing that Chyatte understood the nature of the proceedings.  *See id*. ¶ 10.  Because the court recognized and reasonably applied the standards of *Faretta* and *Dusky*, its decision was neither contrary to nor an unreasonable application of binding Supreme Court authority.

Chyatte asserts that courts must "indulge every reasonable presumption against the waiver."  Br. in Supp. at 23 (citing cases).  This is true when the State claims a defendant waived a right, but the defendant was neither advised of the right nor asked whether he waived it.  *See Glasser v. United States*, 315 U.S. 60, 70 (1942); *see also Brookhart v. Janis*, 384 U.S. 1, 8 (1966).  The presumption does not apply when the record shows "an intentional relinquishment or abandonment of a known right or privilege."  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).  Making a record to show a knowing and voluntary waiver is the rationale for holding a hearing when a defendant wants to represent himself, *see Faretta*, 422 U.S. at 835; Trial Tr. at 78:8–11, and for holding a change of plea hearing when a defendant wants to plead guilty, *see, e.g.*, Fed. R. Crim. P. 11(b).  After such hearings, courts do not presume a waiver is invalid.

### (ii)  § 2254(d)(2)

The Montana Supreme Court's decision relied on a reasonable determination of the facts in light of the evidence presented to it.[9]  Chyatte's conduct in jail in

---

[9]  At the hearing on Chyatte's motion to determine whether he was competent to waive

July, which extended even to smearing his feces about his jail cell, was sufficient to raise a "bona fide doubt" about his competency to proceed.  And Dr. Stratford testified that abruptly ceasing Chyatte's mood-stabilizing medications without evaluating his mental state, assuming that is what occurred, would risk a resurgence of the poor mental state the medications were designed to ameliorate.  *See also* Stratford Report (Doc. 2-1 at 90–100).  But Dr. Stratford also testified that Chyatte began taking these medications once again, at full therapeutic dose, on August 1, 2012.  It was impossible to say for sure, he said, but in "roughly mid-August," Chyatte's medications were likely "on board and metabolically available."  Trial Tr. at 685:4–687:1.

The record corroborates Dr. Stratford's projection.  At the August 23 *Faretta*

---

counsel, Dr. Stratford testified that, "for the purpose of psychiatric assessment," see Hr'g Tr. at 687:14, he believed competency under the *Dusky* standard was different from an ability to waive rights.  *See* Hr'g Tr. at 687:14–688:5.

> I believe it should have involved a mental assessment.  From what I understand, you know, he was expansive, paranoid.  I understand I wasn't here, but there were—he even got taken out of the courtroom at one point.  That—that there were indications that would have said that maybe looking at his belief system and whether or not he was delusional and hearing voices, not by the judge but by the detention center or somebody down there, could have well have been done to kind of assess whether he was tracking well enough to waive his rights.

Hr'g Tr. (Doc. 16-3) at 688:7–17.

Trial judges decide whether a defendant is competent and knowingly and voluntarily waives his rights.  Mental health professionals provide invaluable assistance.  They might bring to light a "bona fide doubt" about a defendant's competence, and they might help a judge to decide whether a defendant is able to understand the nature of the proceedings and to assist counsel.  But *Dusky* remains a legal standard, not a psychiatric one.  Even if Chyatte was, in July 2012, "psychotic," the term is not a legal one.  Dr. Stratford did not explain what the relationship is between psychosis and the *Dusky* standard.  In fact, he seemed to say that Chyatte met the *Dusky* standard.  *See* Hr'g Tr. at 678:20–688:5.

hearing, Chyatte clearly understood the questions the trial court asked him, responded appropriately, gave no sign of inability to concentrate, and readily followed lines of thought. He gave no indication of grandiosity or belief that everyone else was inferior to him. *See, e.g.*, Trial Tr. at 86:24–87:19. He understood that he could not use his role as an advocate to tell his version of the facts. He knew he would have to testify if he wanted to "make a statement" to the jury. *See* Trial Tr. at 85:5–15. He took the point of the trial court's impromptu example of the kind of assistance he could and could not expect from Kammerer as standby counsel. *See id*. at 90:5–91:11. He raised an issue that required a pretrial hearing with testimony from the case detective. *See id*. at 96:17–98:9. He requested subpoenas for two witnesses because he understood that "just because they are subpoenaed [by the State], does not mean they will be called as witnesses." *See id*. at 98:10–100:12. After a digression by the trial court, he turned the colloquy back to his concerns, demonstrated a grasp of potential impeachment evidence, and requested a photograph to use for the purpose. *See id*. at 106:2–8. He also understood and raised nuts-and-bolts issues of access to the law library at the jail and copying documents. *See id*. at 106:10–107:11.

The state courts did not ignore Dr. Stratford's opinion. They recognized and addressed the concern he raised. They took into account Chyatte's own actions and conduct in court before he waived his right to counsel. They found that

Chyatte knew what he was doing and made his choice with his eyes open.  *See Faretta*, 422 U.S. at 835.  Their adjudication was not unreasonable.

### (iii)  Conclusion: Competency to Waive Counsel

Chyatte does not overcome § 2254(d)(1) or (2).  This claim is denied.

### 3.  Claim C:  For-Cause Challenge to Prospective Juror

The Montana Supreme Court denied this claim on direct review.  *See Chyatte*, 2014 MT 125N ¶ 8.

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  "[A] juror who has formed an opinion cannot be impartial."  *Reynolds v. United States*, 98 U.S. 145, 155 (1878).  Voir dire is the tool used to find out whether a juror has already formed an opinion and to "identify juror bias."  *Patton v. Yount*, 467 U.S. 1025, 1038 (1984).  For example, a for-cause challenge might arise from a juror's equivocal or hesitant responses to questions or from circumstantial evidence suggesting that "an average person in the position of the juror in controversy would be prejudiced."  *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000) (emphasis omitted); *see also id.* at 1110–14.  Justice O'Connor once noted that "some extreme situations . . . would justify a finding of implied bias."  *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring).  As examples, she cited "a revelation that the juror is an actual employee of the

24

prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Id*.

Chyatte challenged prospective juror Overholtzer for cause because she was an employee of the clerk's office.  During its voir dire, the State asked whether the jurors knew the participants or any of the likely witnesses.  Overholtzer said that she knew Clint Kammerer, Chyatte's standby counsel, because of her work and because he represented her ex-husband.  She also knew Walt Dinges, the city police department's evidence custodian, again through her work.  She said her acquaintance with them would not influence her view of the case.  *See* Trial Tr. at 171:6–172:2, 195:22–196:3.

When the State had nearly finished its voir dire, the trial court took a recess. The State examined two prospective jurors outside the other jurors' presence.  One was excused for cause.  *See* Trial Tr. at 222:22–223:13, 227:19–228:14, 230:17– 232:19.  Chyatte had not yet begun his portion of voir dire, but during the recess, he moved to exclude Overholtzer.  He stated that she "had prior involvement in this case," and he produced an email she had sent to the county attorney and Kammerer in the course of the litigation.  Viewing the email, the trial court said, "[T]hat was a very ministerial thing," and rejected the challenge.  It also said, "I'll let you inquire about this" in his upcoming voir dire.  *See* Trial Tr. at 241:5–

25

242:17; *see also* Questionnaire and E-mails (Doc. 2-1 at 65–67).

Chyatte did not follow up. *See id*. at 246:12–247:21. Because one of the parties used a peremptory strike, Overholtzer was not a member of the jury. *See id*. at 258:11–15.

Clerks handle many cases. Their jobs generally require tracking and delivering notice of filings, not reading them. Unlike employees of a prosecutor's or a defender's office, they do not work for an entity that has a stake in the outcome of the case. The transcript does not support an inference that Overholtzer was familiar with the contents of Chyatte's file, much less that she had an opinion about the merits of the case. Questioning might have shown otherwise, but Chyatte did not ask any questions of her.

The Montana Supreme Court's decision meets neither prong of § 2254(d). This claim is denied.

## B. Claims D, E and F, G, H, I, and J

The Court reviews these seven claims *de novo*. The Court assumes the facts Chyatte alleges are true unless the record contradicts them. The question is whether his allegations support an inference that he was deprived of a federal right.

### 1. Claim D: The Second Knife

Chyatte claims the trial court deprived him of a fair trial by preventing him from introducing a photograph and questioning witnesses about a second knife

26

found at the Wilma.  *See* Pet. at 4–7, 19; Br. in Supp. at 4–5, 30–32 (Doc. 2 at 12–13, 38–40).

In his cross-examination of Officer Harrington, Chyatte said, "I have a photograph from State's evidence showing, there was a second knife found on the premises."  The trial court said that Chyatte could not show the photograph to the jury unless he called a witness to authenticate it and link it in some way with the evidence in the case.  *See* Trial Tr. at 392:23–394:18.  A recess was called to discuss the issue.  Chyatte said that Officer Corbett took the photograph.  The trial court said, "Then Officer Corbett's the guy you ought to ask about it."  *Id*. at 396:3–8.  Chyatte asked to subpoena Corbett, and the trial court agreed to allow it. *See id*. at 397:13–24.

Chyatte later asked Detective Lear whether she was aware of a second knife having been found at the crime scene.  She was, and she also agreed with Chyatte that, according to Officer Corbett, the photograph showed the second knife.  *See* Trial Tr. at 427:2–428:6.  The State did not object to admission of the photograph. *See id*. at 428:13–20.  Everyone appeared willing to allow Lear to read Corbett's report aloud to show where in the theater the knife was found, but the report did not specify the location.  *See id*. at 429:21–430:13.  The trial court did not admit the photograph for lack of foundation, but it reiterated that Chyatte could call the officer or anyone else who might be able to testify about where the knife was

found.  *See id*. at 429:18–20.

Officer Dinges, the evidence custodian, testified that a second knife was checked out of the police evidence room and taken to the crime lab.  *See* Trial Tr. at 456:25–458:1.

Chyatte did not call Officer Corbett and did not ask the forensic examiners from the crime lab whether they tested a second knife.  In closing argument, rounding out his discussion of the evidence, Chyatte concluded:

> You've heard about a second knife that was never tested, and is still out there two years later, floating around.
> The State has attempted to build a case on conjecture, mistruths, and questionable science.  When viewed holistically, every piece of evidence indicates the State has prosecuted the wrong man; in the process, ignoring evidence of another attacker altogether.

*See id*. at 631:9–16.

The trial court did not err by declining to admit the knife in the absence of authenticating and foundational testimony.  Chyatte knew how to admit the second knife into evidence.  Noting prevented him from doing so.  In addition, the jurors heard about a second knife, and they knew the State did not refute its potential connection with the incident.  Having chosen not to pursue admission of the second knife, Chyatte said exactly what a competent attorney would have said about it in closing argument.  No federal constitutional error arises on these facts. This claim is denied.

## 2.  Claims E and F:  Police Reports

Chyatte believes the trial court erred by failing to allow him to cross-examine witnesses about police reports and/or by refusing to dismiss the case on the grounds that reports were altered or deleted.

### (a)  Factual Background

The issue arose because dates listed on the police reports produced in discovery seemed to indicate the reports were reviewed four months before they were even created.  *See, e.g.*, Pet. Ex. D (Doc. 2-1 at 57) (showing "Date" of 7/12/2011, "Report Date" of 3/17/2011, and "Review Date" of 11/12/2010); *see also* Pet. at 7–8; Br. in Supp. at 1 ¶¶ 3–4, 4–8 (Doc. 2 at 9, 12–16); Pet. App. Ex. D (Doc. 2-1 at 56–63).  In addition, some reports appeared to be omitted entirely.  *Compare, e.g.*, Pet. Ex. D (Doc. 2-1 at 63) (showing "Supplemental" reports by Nelson, Dinges, and Happ, but with no narrative attached), *with id.* (showing report by Lear with narrative attached).

The trial court held an evidentiary hearing.  Detective Lear testified that the police department's Logisys information management system automatically logged the dates of activity in the reporting system.  Not everyone who accessed the system wrote a report.  For example, Dinges, the evidence custodian, did not write a narrative, and the printed report did not show why he accessed the system.  But, according to Lear, a person viewing the computer display of the report inside the

police department would be able to see a "subject line" associated with Dinges'
access and showing that he added DVD backup copies of recorded interviews to
inventory. Lear also said the "Report Date" reflects the date a report was
"processed," that is, electronically transmitted to the FBI, rather than a date that
necessarily marks a significant event in the investigation. The printed version of
the reports did not show the date on which a narrative report was written. *See* Trial
Tr. at 115:23–130:17.

Lear added that Logisys had the capacity to "run the report to show every
action taken on the report: who does it and what the date was." *Id.* at 119:15–21.
In cross-examination, Chyatte continued to question the veracity of the reports and
of Lear's testimony that she had no reason to believe there was anything "generally
nefarious" about the reports:

> Chyatte:    And I'm wondering, how are we supposed to know that
>             that's actually the fact, when what it appears you have
>             these supervisor review dates on your reports that do not
>             jibe with the actual report dates, when the initial report,
>             the review date, coincided with it, but the supplementals,
>             they don't. And so we have what appear to be missing
>             reports, what appear to be backdated reports, and this is
>             an official record. So how do we—
>
> Lear:       I would say that you have to get someone from Logisys
>             to run a report of the dates, times, and I.D.s that
>             generated any changes and have them bring it in. That's
>             the only thing I can say.

Trial Tr. at 127:8–20. Chyatte did not request a report from Logisys, a subpoena,

or time to obtain the additional report.

The trial court pointed out that Chyatte would "probably have some fun on cross-examination with the officers when they appear on the witness stand during the trial, to completely bamboozle the jury with all this stuff." *Id*. at 129:10–13.

Chyatte responded:

> Chyatte:    My question would be that the victim in this case has positively identified a—a different individual. The defense's concern is that interviews were conducted with this alternate suspect that have subsequently been deleted. And—and I guess I would just like that to be part of the record, that there are quite clearly police reports this [sic] are missing and they are backdated, which draws into question exactly what's going on in the police department.
>
> The Court:  Mr. Chyatte, I—you say that. I don't find that there's anything that's clearly missing or backdated. I think the officer has explained these things, and her testimony is that nothing has been deleted.
>
>             Again, I think it's very confusing. I think the jury is going to be completely befuddled when you wade into this stuff. And I'll let you do it, but at least for purposes of this motion, I'm going to deny it. And I don't think what you say for the record has been proven.

Trial Tr. at 129:22–130:17. The trial court denied the motion to dismiss.

In chambers before trial commenced, the trial court raised the issue again.

*See* Trial Tr. at 235:5–25.

> Chyatte:    Am I still going to be able to cross-examine on the discrepancies of the police reports?

The Court:   The problem is, it's kind of a morass.  Then they've got to explain how there's this discrepancy.  Then we get into all this weird stuff about reviews and when it's logged.  And I think the jury could get so sidetracked into trying to sort that out, that—then it obscures the issue at hand, which is are you guilty of this offense or not?

. . . .

So, no, I'm not going to let you get into that.

. . . .

Well, you can talk about the—any factual materials that in [sic] those police reports, and cross-examine whoever prepared them, about it. . . . But, generally speaking, you can impeach people with prior statements and show that they're either wrong or there's material in there that's different than what they're saying today, or there's additional material they didn't talk about; that kind of stuff.

. . . You can ask the officer, what date did you prepare this report?  I think that's fair enough.

Trial Tr. at 237:19–239:9.  Chyatte asked whether the police reports were evidence that could be made available to the jury "so they can review the dates themselves."  The trial court also declined that request.  *See id*. at 239:10–14.  The State then pointed out that it had contacted Logisys and had a representative ready to testify if necessary.  The trial court reiterated that the potential for delay, confusion, and waste of time outweighed the "minimal probative value" of the reports' oddities.  *See id*. at 240:1–11; *see also* Mont. R. Evid. 403.

**(b)  Analysis**

Chyatte continues to opine that the reports indicate alterations and omissions.  He has not alleged any additional facts supporting his opinion.  His

32

view is contradicted by Detective Lear's testimony at the pretrial hearing.  No federal constitutional claim arises on these facts.  This claim is denied.

### 3.  Claim G:  DNA Evidence

Chyatte makes several claims about the DNA evidence used against him.  A federal court may only consider a claim alleging a "violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Generally, federal law does not govern the admissibility of evidence in state courts.  For example, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), "determine[s] the standard for admitting expert scientific testimony in a Federal trial," not a state trial.  *See id.* at 582.  *Daubert* does not speak to the Due Process Clause, so States are not required to follow its rules or reasoning.  A State may choose to follow it, as Montana has, *see, e.g.*, *State v. Cline*, 909 P.2d 1171, 1177–78 (Mont. 1996), but its application remains a matter of state law rather than a basis for federal habeas relief, *see, e.g.*, *Kinder v. Bowersox*, 272 F.3d 532, 545 n.9 (8th Cir. 2001).

The Constitution does, however, entitle Chyatte to a fair trial.  If a State knowingly introduces testimony that is false or misleading, or allows it to go uncorrected when it appears, and if that testimony is material to the conviction, a petitioner will have a valid federal claim.  *See, e.g.*, *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Alcorta v. Texas*, 355 U.S. 28, 30–32 (1957) (per curiam); *Hayes v. Brown*, 399 F.3d 972, (9th Cir. 2005) (en banc).  Materiality is established if

there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury," that is, whether the verdict is worthy of confidence.  *See Hayes*, 399 F.3d at 984 (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

The question, therefore, is whether Chyatte can show a reasonable probability that a juror might have relinquished reasonable doubt due to false or misleading testimony about the DNA evidence.

### (a)  Testimony at Trial

Chyatte asserts:

> Central to the State's case against Chyatte is what the State purports to be a partial DNA profile allegedly consistent with Chyatte, supposedly found on a knife handle amid a complex mixture of at least three other contributing individuals.  However, the State contends that the remaining genetic material is "too complex" to analyze.
> . . .
> The State Crime Lab testifies that the Lab is not properly equipped to process the type of evidence central to this case.  And yet, the State Crime Lab proceeds to process this evidence nonetheless. . . .

Br. in Supp. at 9, 11 (Doc. 2 at 17, 19) (internal citations to Petition omitted).

These allegations do not accurately reflect the testimony presented at trial.

Lacy Van Grinsven, a serologist and DNA technician at the State crime lab, testified that she examined the items submitted for testing to determine what type of testing would be appropriate.  To avoid destroying any fingerprints, she did not swab the sides of the handle of the knife.  But she swabbed the blade and the end of the handle and put the swabs in the freezer for later analysis.  *See* Trial Tr. at

34

478:23–480:19, 481:12–482:1.  Van Grinsven also testified that blood or skin cells and DNA may be deposited on an item by direct contact or by transfer from one item to another, such as a floor to a knife.  *See id*. at 483:14–484:5.

Van Grinsven said a nanogram of DNA was "typically what they use for the DNA analysis."  *Id*. at 486:5–8.  "To get a nanogram of DNA . . . you do need multiple cells," "around 350 cells. . . . [I]t depends on the individual how many cells [are] left behind, when you just touch something."  *Id*. at 487:8–16.  But other factors, such as whether a person is sweating or holds the item, or the composition or texture of the item, are also important.  *See id*. at 488:14–21.

Van Grinsven also said:

We don't typically like to talk about touch DNA[10] in our lab, we don't typically work with it, because there are people when [sic] are called "shedders."  And they'll leave a lot more DNA behind than others.
. . .
    We will do items that have been considered touch DNA.  So if someone touches a gun, we'll swab it and forward it for DNA.  But there are labs, specifically, that are more geared to that.  And they'll use different chemistries with their DNA, like MiniFiler and other things that are specifically for lower amounts of DNA.
. . .
    It's not that we don't "prefer" to work with [touch DNA].  It's just that we don't have as good of luck because the chemistry that we use is a standard identifier chemistry.  And typically you need a nanogram of DNA to get a good DNA result.

---

[10]  Neither party asked for or provided a definition of "touch DNA."  Any transfer of DNA may be accomplished by touch.  As used here, the term suggests an extraordinarily small amount of DNA—the few cells that might be routinely shed by anyone when they only touch the surface of an item but do not hold it frequently, wield it, or shed blood, sweat, or saliva on it.  *See, e.g.*, *Sartain v. State*, 2017 MT 216 ¶ 10 ("seven or eight cells").

Trial Tr. at 487:13–16, 488:24–489:13.

In redirect, the State clarified:

Marks:          When you're talking about good results and other labs
                can get better results with different processes, is what
                you're talking about that, with extremely small
                amounts of DNA, a different process will actually get
                results, whereas what the crime lab uses may not,
                because the amount of DNA is too small?

Van Grinsven:   Yes.  That is correct.
                . . .
                    [T]he results that we get are still good results.
                They're valid.  They mean what they mean.  But
                having a higher amount of DNA works better with the
                chemistries that we use, versus some of the other
                chemistries that other labs use, because they have
                different things in them that are more geared toward
                smaller amounts of DNA.

Trial Tr. at 491:5–492:1.

Chyatte asked whether "touch DNA typically involves less than a nanogram
of DNA."  Van Grinsven demurred and said, "Jen Revis, who is our DNA
analyst[,] would be the one to ask on about [sic] that."  *Id*. at 489:14–18.

Jennifer Revis Siegfried, a serology and DNA analyst at the state crime lab,
was the next witness.  Chyatte did not ask her whether "touch DNA" involves less
than a nanogram or how much DNA she had available for analysis.

Revis testified that the DNA she extracted from Van Grinsven's swabs of
the knife blade were consistent with Moore's known sample.  *See* Trial Tr. at

503:1–4, 503:9–17.  Unlike Van Grinsven, Revis was able to work with a

fingerprint expert to identify areas of the sides of the knife handle that could be

swabbed without destroying potential fingerprints.  Revis swabbed[11] those areas.

*See id*. at 503:5–8, 541:1–543:1.  Looking at 16 loci, or different "markers" on the

DNA molecule, she detected at least three different DNA profiles.  *See id.* at

513:25–514:2.  At nine of the 16 loci, the contributor of the largest amount of

DNA (the "major profile" or "partial major profile") was consistent with Chyatte's

known profile.  At the other seven loci, the mixture of DNA was too complex to

separate out contributors.  *See id*. at 504:17–506:24; *see also id*. at 507:22–24,

517:9–25.  But Revis testified that she would expect to see the same partial major

profile at the nine loci one time in a population of 36 billion southwestern

Hispanics, once in 93 billion Caucasians, and once in 57 trillion African

Americans.  *See id*. at 507:6–508:21.

     Chyatte asked Revis her whether she performed "a combined probability and

conclusion test," a "combined probability of exclusion test or CPE test," or a

"likelihood ratio test."  She said she did not, but she was familiar with them.  *See*

*id*. at 533:21–534:7.  Chyatte did not ask her to explain how she *did* arrive at the

figures she gave or attempt to show the jury that she "misapplie[d] the 'product

---

[11]  In his federal petition and brief, Chyatte does not allude to the "uncatalogued, errant, free-floating swab" that he challenged before and at trial.  *See* Trial Tr. at 133:23–24; *see also, e.g.*, *id*. at 518:9–529:3.  Revis explained it.  *See id*. at 542:14–21.

rule' of statistical analysis to derive an incorrect probability inclusion ratio."  Pet. at 12.  He suggested no reason to believe Revis's figures were inaccurate.

Revis also explained that, by "partial profile," she meant a profile determined from data obtained at fewer than 16 loci.  She did not analyze a partial profile.  She obtained data at all 16 loci, albeit data allowing her to identify the major profile at only at nine of the 16 loci.  *See id*. at 513:5–20.  She told the jury that, assuming it had been possible to determine a profile at the other 7 loci, and assuming it was inconsistent with Chyatte's, that would rule Chyatte out as a contributor of DNA to the handle of the knife.  *See id*. at 514:3–516:8.

Revis agreed with Chyatte that DNA analysis offers room for interpretation in determining the profile.  *See id*. at 518:1–8, 534:16–23.  She clarified that the tests she performed could not show how DNA wound up on the knife handle, *see id*. at 532:21–533:14, and that DNA can be deposited by transfer from one item to another, *see id*. at 530:21–534:15.  Enhancing the possibility of transfer, Chyatte drew the jury's attention to the conditions in which the knife was found.  He also showed that he must shed DNA easily, because his DNA was found on his shirt. *See, e.g.*, *id*. at 487:17–488:14, 510:21–511:18, 547:20–548:14.  This testimony drew on Revis's statement that "[y]ou can't really expect to see DNA from an individual that wore a piece of clothing."  *Id*. at 544:2–18.

Neither Revis nor Van Grinsven testified that the State lab was "not properly

equipped to process the type of evidence central to this case" or that they processed the evidence anyway.  Revis testified that she used methods "generally accepted in the scientific community" and "validated in our laboratory before we ever use it on casework," followed a written protocol at a regularly audited and accredited lab, took and passed proficiency tests twice a year, and submitted her conclusions for review by two other analysts.  Chyatte did not object to her recognition as an expert witness.  *See* Trial Tr. at 496:1–497:14, 499:3–500:6, 543:2–14.

The validity of some methods of DNA analysis and some witnesses' testimony may be open to question.  But Chyatte has not connected questions that others have raised, *see, e.g.*, Pet. Ex. M (President's Council of Advisors on Science and Technology, *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (Sept. 2016) at 75–76, 78) (Doc. 2-1 at 214–215, 217), to the DNA analysis or testimony in his case.  He does not show that Van Grinsven or Revis gave false or seriously misleading testimony.

### (b)  Pretrial Hearing

Chyatte contends that the trial court should have held a hearing to determine "whether or not the novel forensic methodology [was] trustworthy and reliable."  Pet. at 13.  The Court is not aware of federal law requiring a state trial court *sua sponte* to examine the trustworthiness or reliability of evidence.  And Chyatte has not shown that the method employed at the State crime lab was novel.  Revis

testified it was not novel.  *See* Trial Tr. (Doc. 16-3) at 497:22–499:8; *see also, e.g.*,
*State v. Wright*, 2011 MT 92 ¶¶ 18–26.

At a pretrial hearing, Chyatte argued that the State lacked adequate
foundation to admit testimony connected with a supplemental forensic report, *see*
Trial Tr. at 133:13–24 (referring to Swab 00.903, *see* n.11 above), and that "a
partial DNA match in the midst of three other people" was "clearly insufficient to
establish identity in a prima facie case," *id*. at 134:17–135:12.  The trial court ruled
that these issues went to foundation and to the weight of the evidence, not to the
validity of the methodology used.  Chyatte does not allege facts supporting an
inference that its ruling violated his right to due process.

### (c)  Post-Trial Developments

Chyatte asserts that, since his trial, "DNA analysis of 'complex mixtures'
has come under scrutiny."  Br. in Supp. at 27 (Doc. 2 at 35).  That fact does not
show that the trial testimony was false.  Evidence of similar nature continues to be
admitted at trials postdating Chyatte's, even in federal jurisdictions bound by
*Daubert*.  *See, e.g.*, *United States v. Samora*, 954 F.3d 1286, 1291–92 (10th Cir.
2020).

### (d)  Materiality

Finally, the testimony concerning DNA analysis was persuasive, but it was
far from being the only link in the chain.  Descriptions of the culprit were vague or

contradictory, Moore identified someone else, and Lamberton thought the attacker had a blue baseball cap.  But these facts were consistent with the darkness and confusion in the theatre.  Chyatte was seen and recognized by people who knew him.  He called an alibi witness he had not previously mentioned to police, and her testimony was inconsistent with that of Roof, the security guards in the Wilma's front lobby, and Sky Berns.  When contacted by police, Chyatte behaved suspiciously, gave conflicting statements, and refused to allow his hands to be swabbed.  Because these behaviors suggest consciousness of guilt, they are often highly persuasive to juries.  The jury considered all these facts, as well as the possibility that Chyatte's DNA wound up on the knife by transfer and not because he handled it himself.

Revis's testimony might have put the verdict well beyond reasonable doubt. But it is not reasonably probable that the jury would have retained reasonable doubt but for the DNA evidence or the statistical testimony.

### (e)  Conclusion

Chyatte has not shown that the DNA evidence introduced in his case was false or misleading.  He points to no facts supporting an inference that his DNA profile was actually inconsistent with the major profile determined at nine of the 16 loci.  This fact is distinct from Revis's statistical assessment that there was a probability of 1 in 93 or 36 billion that someone other than Chyatte contributed the

major profile.  Thus, even if the statistical testimony had been disputed—and Chyatte did not ask any questions about it—he still would not be excluded as the contributor, and other evidence in the case was consistent with his guilt.

The Court does not perceive any reason to suspect that the trial evidence was false or seriously misleading or that the jury's verdict was materially affected by it. This claim is denied.

### 4.  Claim H:  Cumulative Error

Chyatte claims that the cumulative effect of trial errors deprived him of a fair trial.  *See* Pet. (Doc. 1) at 18–22; Br. in Supp. at 3–4 (Doc. 2 at 11–12).  But "no error of constitutional magnitude occurred," so "no cumulative prejudice is possible."  *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).  This claim is denied.

### 5.  Claim I:  Sentencing

Chyatte asserts that the trial court predicated its sentence on "perjured testimony" given by Nurse Tom Stahl, an employee of Spectrum, the company responsible for providing medical care to inmates at the Missoula County Detention Center.  *See* Pet. (Doc. 1) at 24–27; Br. in Supp. at 23–24 (Doc. 2 at 31–32); *see also* Pet. Exs. I, J, K (Doc. 2-1 at 101–110).

The Due Process Clause requires that sentencing judges rely on materially correct information.  *See, e.g.*, *Townsend v. Burke*, 334 U.S. 736, 740–41 (1948);

*United States v. Hill*, 915 F.3d 669, 674 (9th Cir. 2019).

The record defeats Chyatte's claim.[12]  At the outset of the hearing on August 16, 2012, before Stahl testified, Chyatte and the trial court discussed his medical condition and complaint.  The trial court agreed to look at Chyatte's medical records.  *See* Hr'g Tr. (Doc. 16-17) at 14:4–15:12.  It asked some questions of Stahl and Dave McLean, the lawyer for Spectrum.  Stahl said that he believed Chyatte was "malingering" because he had not seen any objective reason why Chyatte needed a wheelchair.  But the trial court hardly took Stahl's testimony at face value.  *See* Hr'g Tr. (Doc. 16-17) at 18:18–23:11.  McLean tried to help Stahl, but he did not sway the trial court either:

| | |
|---|---|
| The Court: | [D]on't you follow?  I'm just trying to get the facts here.  A minute ago he [Stahl] said [Chyatte] hadn't been seen by anybody since March.  In March there were no indications for—of any problems, and that there hadn't been any kites or any requests for anything since.  And then in the next word [Stahl] said, we started medications again last month.  And I said, why?  He said, because he requested them.  Now, I'm just trying to get the sequence, and I understand whether he's making complaints or not. |
| McLean: | I think— |
| The Court: | Don't get angry with me, Mr. McLean. |
| McLean: | I'm not, Judge, but you're making leaps.  You're not |

---

[12]  On May 29, 2012, the trial court invited Chyatte to submit a letter from his doctor, whom Chyatte had said practiced at the Mayo Clinic in Minnesota.  *See* Trial Tr. at 60:18–62:25. There is no indication Chyatte provided one.

listening to what he's saying.  You're making some leaps.

. . .

The Court:        [M]y impression was, there wasn't any kind of interaction at all [between Chyatte and medical care providers], and I find out there hasn't been.  And he's making complaints of physical symptoms here today.  He certainly has made complaints to this Court.  I don't know what he's told you guys or hasn't.  But he's clearly made complaints to the Court that he's suffering, and he's in need of treatment.

And all I'm saying is, maybe we ought to have somebody take a look at him and see if there's anything to it.  Six months ago isn't current, in my view, given his current complaints.

. . .

[H]is lab work was done six months ago, correct?

McLean:           Correct.

The Court:        So, let's do it again and see if anything has changed.

McLean:           So I'm clear, you want him physically examined or just the lab work done?

The Court:        I think he should be physically examined.  He's making physical complaints.  I can see from here—and I'm a good 25 feet from him—the redness in his knuckles.  Now, maybe he's done something to cause that.  I don't know.  But . . . . I think somebody ought to look at it.  I think some lab work ought to be done.  If he's making all this up—and I'm not convinced that he isn't—he—you know, so be it.  But at least it deserves a look, and that's all I'm suggesting.

Hr'g Tr. (Doc. 16-17) at 23:23–24:12, 25:9–20, 26:12–27:4.

Chyatte indicated that he believed he should have a visit with a doctor

44

competent to use "several different diagnostic techniques" and/or "X-rays and physical examination" that the facility was not equipped to provide and did not have "the specialty or expert knowledge to deal with." *Id.* at 29:5–15. The trial court said it would take a more moderate approach:

| The Court: | . . . [T]he lab tests are what physicians typically rely on, along with the physical exam in making decisions. It seems to me if we come up with some abnormal lab test, that may warrant further review by somebody with more credentials than the physician's assistant. But if the lab tests come within normal ranges, then I don't know what more we're going to do for you, sir. |
| . . . | |
| | I can only do what I can do for you, sir. And the best I can do is order another exam, a new round of lab tests. There may be wonderful stuff out there, but you know, we can only do what we can do. |
| Chyatte: | And that's fine, and I appreciate the Court taking time to hear me today, I do. Thank you for your time as well. |

Hr'g Tr. (Doc. 16-17) at 29:16–22.

Five days later, another pretrial hearing was held. The trial court noted it had "ordered that [Chyatte] be diagnosed and examined" by administration of a blood test, to "confirm the existence, or lack thereof, of something know as the RA factor, which would establish the presence of rheumatoid arthritis, which he claims to have." Trial Tr. (Doc. 16-3) at 74:8–12.

Chyatte refused the test. The trial court said, "If he doesn't want it tested, there's only one reasonable conclusion that can be drawn from that." *Id.* at 74:18–

20.  Despite being told that he could not speak due to his representation by counsel,

Chyatte said, "I did not refuse to be diagnosed; I refused to be diagnosed by

Spectrum."  The trial court ordered him out of the courtroom.  *See id*. at 78:13–22.

> At sentencing on March 1, 2013, the trial court said:
>
> One of the problems we confronted in this case was his medical issues
> in mid July—or, excuse me, mid August, when we had that hearing . .
> . .
>         And the whole focus of that had to do with his alleged lupus
> and arthritis.  I was very concerned about him, because I didn't think
> that the jail maybe was taking him seriously in treating him.  So I
> ordered him to go under [sic] testing to verify the presence of those
> diseases, and he refused.
>         Now, in my book, some guy that I'm trying to help, that claims
> he has a medical condition and I say Fine, let's have it medically
> diagnosed and we'll treat it, and refuses when push comes to shove,
> is—is probably malingering because he knows that the jig's up and
> he's going to be found to not have these diseases.

Trial Tr. (Doc. 16-3) at 747: 6–21.  The trial court did not mention Stahl or the

detention center.

Chyatte's counsel asked for a brief recess to locate "some papers that can

substantiate this."  *Id*. at 748:17–23.  The recess was granted, but no papers were

provided.  The trial court permitted Chyatte to explain why he refused the medical

evaluation.  He explained.  *See id*. at 750:2–13.  He added that, "since that time, I

have been seen by Spectrum medical, who did confirm diagnosis for lupus, and

charged me $10 for the privilege of being diagnosed with lupus, as per my medical

records. . . . [T]hat is the receipt that everybody's looking for right now."  *Id*. at

750:14–19.  Chyatte continued:

| | |
|---|---|
| Chyatte: | I've given documentation from a rheumatologist at Hazelden, which is a very nationally respected rheumatologist. |
| The Court: | Hey, I've got it right here.  Tell me where is it. |
| Chyatte: | I'm not trying to irritate you or pick a fight.  At this point, it's just—whatever. |

Trial Tr. (Doc. 16-3) at 750:10–751:2.

The trial court plainly did not rely on Stahl's testimony.  It relied on its own review of the records Chyatte provided (and failed to provide) and its own experience with him.  The record contradicts any inference that the sentence was based on Stahl's testimony (and also does not support an inference that Stahl's testimony was perjurious).  At each opportunity Chyatte had to substantiate the facts he wanted the trial court to believe, he did not provide the evidence.  No federal due process violation arises on these facts.  This claim is denied.

### 6.  Claim J:  Ineffective Assistance of Appellate Counsel

Chyatte contends that appellate counsel unreasonably omitted claims regarding the trial court's sentence, the police reports, admission of the DNA evidence, and the second knife.  *See* Pet. at 27–29; Br. in Supp. at 24–32 (Doc. 2 at 32–40).

Claims of ineffective assistance of appellate counsel are governed by the familiar *Strickland* standards.  *See Smith v. Robbins*, 528 U.S. 259, 185 (2000);

*Jones v. Barnes*, 463 U.S. 745, (1983).  Chyatte must show both that appellate counsel's performance was unreasonable and that there is a reasonable probability the Montana Supreme Court would have ruled in Chyatte's favor on one or more claims.  *See Strickland*, 466 U.S. 687–88, 692.

Chyatte did not lay adequate foundation to obtain admission of the second knife, to challenge the admissibility or novelty of the DNA evidence, or to challenge the methodology behind Revis's statistical testimony.  Under Montana law, "[t]he *Daubert* test does not require a district court to determine whether the expert reliably applied expert methods to the facts."[13]  *State v. Clifford*, 2005 MT 219 ¶ 30.  For the reasons already explained, the facts of the case simply do not support Chyatte's claims about the police reports, the DNA evidence, or his sentence.

This claim is denied.

## V.  Motion for Counsel

Chyatte has filed a second motion asking the Court to appoint counsel to represent him.  *See* Mot. for Counsel (Doc. 29).  Because his claims lack merit, appointment of counsel is not in the interest of justice.  *See* 18 U.S.C. §

---

[13]  In his motion for counsel, Chyatte claims the State "now acknowledges that the forensic methodology it used to prosecute Chyatte is absolutely without merit."  Mot. for Counsel (Doc. 29) at 2.  The Court does not know why he thinks so.  Montana law holds that "[i]f the [trial] court deems the expert qualified, the testimony based on results from that field is admissible—shaky as that evidence may be."  *Clifford*, 2005 MT 219 ¶ 28; *see also, e.g.*, *Sartain v. State*, 2017 MT 216 ¶ 10.

3006A(a)(2)(B).

## VI.  Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), Rules Governing § 2254 Proceedings.  A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Chyatte's claims do not meet the relatively low threshold for a COA. Alleged bad advice from pretrial counsel could have dissuaded a person in Chyatte's position accepting a reasonable plea offer, but Chyatte rejected the plea offer when the State renewed it, and he was not prejudiced in any other way by counsel's advice.  "Bona fide concern" about his competency to proceed came to light after trial, but the state courts applied the correct legal standards in a reasonable way and reasonably determined the facts.

Chyatte did not lay adequate foundation to challenge a juror for cause, and there is no reason to believe he could have.  He did not do what he knew he must if

he wanted to have a second knife found at the scene admitted into evidence. Regardless, he let the jury know that it existed and that the State had not disproved any connection between it and the crime. A pretrial hearing put to rest the possibility that the odd features of the police reports indicated some malfeasance, and Chyatte adds nothing new to undermine the testimony at the hearing. At trial, Chyatte was permitted to make hay by asking the police witnesses when they prepared their reports, but he decided not to ask. He has not shown the methodology employed by the State crime lab in its DNA analysis or its statistical analysis was either novel or unreliable, and there is no reasonable probability he would have been acquitted but for the DNA evidence. The trial court clearly did not rely on a nurse's testimony but made its own assessment of Chyatte's medical records and conduct, as well as all the other information about the case, in determining the sentence. Finally, appellate counsel did not prejudice Chyatte, because the issues he believes counsel should have raised lacked merit.

Despite the extensive record, the lengthy state postconviction proceedings, and the length of this Order, reasonable jurists would find no cause for concern that Chyatte's trial was anything other than fair. A COA is not warranted.

Accordingly, IT IS ORDERED:

1. Chyatte's motion to appoint counsel (Doc. 29) is DENIED.

2. The petition (Doc. 1) is DENIED.

50

3.  A certificate of appealability is DENIED.  The clerk shall immediately process the appeal if Chyatte files a notice of appeal.

4.  The clerk shall enter, by separate document, a judgment in favor of Respondents and against Chyatte.

DATED this 15th day of September, 2022.

Dana L. Christensen, District Judge
United States District Court